though the court, in effectuating the intent of the testator, and looking to the substance of the power, would certainly not suffer a fault in syntax to work its destruction, yet, upon a nice point of synonymy or tautology, the criticism made may not be without influence in indicating whether the intent and direction of the testator are not wholly conveyed by the word "consent." Aside from such hypercriticism, we think that the written "consent" of Col. Burr to the sale necessarily imports his "approbation," and that the requirements of the power are thereby satisfied. We do not perceive that any further significance would be afforded by using both words. No import or effect is pointed out as legally applicable to both terms, which "consent," as employed, does not of itself express. We are to assume that the trustee and Col. Burr acted in good faith towards the grantee, and intended that the deed should be executed conformably to the power, and the "consent" of Col. Burr to the sale and conveyance for that purpose must be regarded as involving his "approbation" of both. Judgment for defendant.

WALES (THAYER v.). See Cases Nos. 13,-871 and 13,872.

## Case No. 17,059.

### WALING v. The CHRISTINA.

[Deady, 49;[1] 1 Ore. 430.]

District Court, D. Oregon. Feb. 8, 1862.

SEAMEN'S WAGES—VOYAGE IN BALLAST—SHIPPING CONTRACT—MODIFICATION AT SEA.

1. In a suit for seaman's wages the maxim that "freight is the mother of wages" does not apply to a voyage commenced and intended to be made in ballast, for in such case it was not expected that freight would or could be earned.

2. A contract to ship as seaman on a trading voyage on the coast, without any definite stipulation as to the time or place of termination of the voyage, when justice to the seaman requires it, will be held void.

3. A contract entered into between master and seaman, at sea, changing the terms or duration of the original contract, should be closely scrutinized, and if prejudicial to the seaman's interest, disregarded.

In admiralty.

Edward W. McGraw, for libellant.
J. H. Mitchel, for claimant.

DEADY, District Judge. This is a suit by David Waling for seaman's wages. The libel alleges that the libellant shipped, without signing articles, on the sloop Christina, at Port Townsend, W. T., on October 28, 1861, on a voyage via Bellingham Bay to Portland and back, upon the agreement that at Portland the master would purchase a cargo of apples and carry them to Port Townsend, and give the libellant one third of the profits as his wages; that the sloop proceeded to Portland via Bellingham Bay

1 [Reported by Hon. Matthew P. Deady, District Judge, and here reprinted by permission.]

in ballast, where she arrived about November 20; that the master did not purchase the cargo of apples, but after remaining at Portland until December 17, sailed for Shoalwater Bay and elsewhere, without notice to libellant, and without payment of his wages; and that libellant remained on said sloop and did his duty as seaman thereon between October 28 and December 17, aforesaid. The master, George Thompson, intervening for the interest of the owner, J. K. Thorndyke, answered the libel, denying the allegations thereof, and alleging that libellant shipped at Port Townsend on a general coasting voyage, to go wherever the interests of trade might require; that the libellant was to have one third of the profits of the voyage for his wages; that the master gave libellant notice of the sailing of the sloop from Portland, and libellant refused to go; that the sloop Christina is a coasting vessel of 13 $32/95$ tons burden, and up to the time libellant left her she had not earned expenses, and therefore the libellant is not entitled to any sum as wages. The master and two seamen, Quaile and Fisher, were examined as witnesses on behalf of the libellant. No testimony was offered by the claimant. Quaile sailed in the sloop from Port Townsend, and Fisher was shipped just before the sloop left Portland for Shoalwater Bay. The master is the principal witness. His statements on the stand do not agree in some material respects with the allegations of the answer. Besides, the inquiry involves the propriety of his own conduct in the transaction to such an extent that the court is inclined to take his statements with allowance. In the answer, he denies unqualifiedly that the libellant shipped for a voyage to Bellingham Bay, thence to Portland, and thence back to the port of departure or either of them. On the stand, he admits that the sloop sailed for Portland to touch at Bellingham Bay, where he expected to load with coal for Portland, but, not obtaining the coal, she proceeded in ballast for the latter port. He also admitted that he expected to meet a draft in Portland, with which he intended to buy a cargo of apples, or something else, and return with it to Port Townsend or Victoria, but that he did not receive the draft or he would have done so.

From the testimony of both the master and Quaile, it appears that when the sloop was about to sail from Port Townsend, the master asked the libellant if he would go with him on her to Portland; that the libellant replied in the affirmative and went aboard, as far as appears, without any stipulation as to the terminus of the voyage, other than that implied in the request and consent to go to Portland, or the rate or mode of payment of his wages. The master also testified, that when at sea four or five days, he told libellant that he expected money at Portland to buy a cargo of apples, which he expected to take to Port Townsend; that he was to have one third of the profits of the voyage, and he would give libellant the same which the latter assented to; but insists that this understanding was subject to his right

to go anywhere else, in his discretion, on a general trading voyage on the coast, and that there was no explicit understanding how long libellant was to remain on board. Quaile testifies, that after the first hiring at Port Townsend, he heard the master tell libellant that he would give him the same wages that he got himself, and that he heard the draft mentioned at same time, but nothing said about apples. When this conversation took place, the witness does not state, except that it was after the first hiring at Port Townsend. From the similarity of the circumstances, it is reasonable to infer that, so far as it goes, it is a part of the conversation testified to by the master as occurring four or five days at sea. The master testified that he did not get the draft at Portland, and in consequence did not purchase the cargo of apples and return with them to Port Townsend, as he contemplated or might have done, and that after remaining at Portland until December 17, he took a cargo of freight for Shoalwater Bay, with the intention of returning to Portland with a cargo of oysters; that on that day, in the afternoon, he informed libellant of the intended voyage—that he might sail·in ten minutes or three days—but when the sloop was ready, he intended to sail, if he went alone; and that libellant might make the voyage, if he wanted to, which he refused. In the course of the evening of that day, it appears that a conversation occurred at Shelby's store, between the libellant, his proctor, the master and Shelby's clerk, from which it is pretty evident that the libellant then contemplated arresting the vessel for his wages, and that the master and clerk were aware of or suspected that such was his intention. At that time the master said, in the presence of the libellant, that he would sail in the morning, but he testifies that afterwards the clerk advised him to sail that night, which he did do—getting under way about eight o'clock. The wind was very light, and at Sauve's Island, a distance of about eight miles, he laid by until the forenoon of the next day, when he proceeded down the Columbia river with a light wind, pulling and drifting some of the time. There was a strong current in the river and no perceptible tide. At the time of sailing libellant's clothes were not on the·sloop, but were left with some one on a steamboat at the wharf, nor was the libellant on the sloop that afternoon. While it appears to be true that the sloop left port in the night, without wind or tide, or other ordinary inducement for such sailing, I conclude from the evidence, that it was not for the purpose of preventing libellant from making the voyage to Shoalwater, but to avoid being arrested by him for his wages.from Port Townsend to Portland. I think it sufficiently appears that libellant had already declined to make the particular voyage. Assuming this to be so, what effect does it have upon the libellant's claim for wages? This depends upon the nature of the hiring. It appears that by the first contract, at Port Townsend, the libellant simply shipped as a sailor for the voyage to Portland, without any special agreement as to

the mode of payment or amount of his wages. Upon this contract or state of facts, the libellant was not bound to proceed with the sloop any farther than Portland, and was entitled to the customary wages for the·voyage performed. The maxim, that "freight is the mother of wages," does not apply, for the reason that having sailed in ballast for Portland, it was not expected that any freight would be earned. True, the sloop touched at Bellingham Bay, with the intention of taking on coal for Portland, if it could be had; but I think this was a mere incident of the voyage, without changing substantially its general direction or character. It only involved a detour of about fifty miles on an inland sea or water, on a voyage of at least three hundred and fifty miles. In the application of this hard, but necessary, rule. I think it just and reasonable to regard this voyage as one made in ballast and without any expectation of earning freight.

The only remaining question to consider is the nature and effect of the agreement said to have been·made at sea, by which the libellant was to have one third of the.profits of the voyage to Portland and back to Port Townsend, in lieu of wages. It is very evident, that whatever might have been the ultimate intention of the master as to the nature and limit of the voyage, that he made the impression on the mind of the libellant, that he should have one third of the profits of a specific voyage from Portland to Port Townsend, with a cargo of apples, which the master was to purchase in the former place; and in this sense it must be understood and taken against the master. And, notwithstanding his testimony, it is not probable that the master had any other purpose at the time of the conversation with the libellant. Such being the case, the contemplated voyage and venture were alike prevented or broken up by the failure to purchase the cargo of apples and by the sailing of the sloop to Shoalwater. The libellant was not bound to proceed on the new voyage or take a share in the new venture for oysters. But if this alleged contract at sea, really was made as claimed and understoood by the master, then it may be called a very indefinite edition of a class of shipping contracts which have been severely animadverted upon by both the English and American courts of admiralty; as for instance, when the shipping articles specify a voyage from a certain port to another "and elsewhere." In some instances, where justice to the seaman required it, such a provision has been held void. Here, according to the master's testimony or professed understanding of the contract, notwithstanding the designation of certain ports in the agreement and the representations of specific arrangements for cargo, he was at liberty to continue this voyage as long and wherever upon this coast, as in his judgment the interests of trade might require. If such was the contract, and the law would enforce it, then the libel-

lant was in effect tied to the deck of this particular vessel, as long as she remained afloat, if the master for any reason, or without reason, saw proper to keep on coasting for trade, unless he should desert, and thereby forfeit his earnings. Again, this alleged contract is open to another objection. It does not appear to be regular or proper for a master to enter into new and special contracts with the seaman after the voyage is commenced, and while at sea. The relation between the parties is such, on board ship, at sea, that they do not deal upon equal terms. It may be that such contracts are not necessarily void, but in any event the circumstances under which they are made should be closely scrutinized, and if found, or appearing to be, prejudicial to the rights or interest of the seaman, disregarded. In any view of the case, the libellant is entitled to recover the customary wages from the time of sailing from Port Townsend—October 28, 1861—until the departure of the sloop for Shoalwater Bay—December 17, 1861. The customary wages, as appears from the proof, is $30 per month. Decree, that the libellant recover the sum of $50 and his costs.

END OF CASES IN BOOK 28.

*